**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STRATITUDE, INC., | ) | Case No. 17-_____ |
| | ) | |
| Debtor. | ) | |
| | ) | Honorable Jack B. Schmetterer |
| | ) | |

**DECLARATION OF ROBERT H. STEELE IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST-DAY MOTIONS**

I, Robert H. Steele, under penalties as provided by law pursuant to 28 U.S.C. § 1746, hereby certify that the following is true and correct to the best of my knowledge, information and belief (the "**Declaration**") in the above captioned case (**Chapter 11 Case**"):

## I.    PRELIMINARY STATEMENT

1.    I am the Chief Executive Officer of Stratitude, Inc., a California corporation (the "**Debtor**", "**Company**" or "**Stratitude**")[1], wholly owned subsidiary of Quadrant 4 System Corporation, debtor and debtor in possession in that certain Chapter 11 case filed on June 29, 2017, and pending in this District as Case No. 17-19689 ("**Q4**" or the "**Q4 Chapter 11 Case**", and together with this Chapter 11 Case, the "**Chapter 11 Cases**"). By resolution dated August 31, 2017, the Debtor's Board of Directors ("**Board**"), with the support of the Debtor's senior secured lender, BMO Harris Bank, N.A. ("**BMO**"), appointed me as the Debtor's sole officer, and I did accept the roles of President, Chief Executive Officer, Chief Financial Officer, Secretary and Chairman of the Debtor. As a result, I replaced the Debtor's prior Chief Executive Officer, Nandu Thondavadi ("**Thondavadi**") who together with Dhru Desai ("**Desai**"), resigned

---

[1] The Company's website is www.stratitude.com.



as the officers (and directors) of the Company on December 5, 2016. In my newly appointed capacity, I have also replaced Khannan Sankaran (**"Sankaran"**), who previously was in charge of operating the Company. Mr. Sankaran remains employed by the Company in a key management role. Mr. Sankaran was also one of the principals of the Company (prior to its sale to Q4 on November 3, 2016) and Agama Solutions, Inc. *(see "Stratitude/Agama Transactions" as defined, and more fully described, below).*

2.    The Debtor is engaged in the information technology sector as a provider of U.S. based consulting services to a variety of industries using human resources, facilities and hardware and software assets located in the United States (collectively, the **"Business"**). The Company places billable consultants at end-user customers or through other contractors. There is a markup on each consultant deployed to a client site. The Company's workforce consists of approximately 41 billable consultants; 6 sales, general and administrative employees; 9 independent contractors; and 42 "Margin Share" individuals[2]. Aside from the location of its employees and customers, the nature of the Business is extremely similar to that certain business unit of Q4 commonly known as "Legacy Staffing" which was sold in the Q4 Chapter 11 Case pursuant to prior orders of the Court.

3.    The Debtor's principal executive offices are located in Q4's Schaumburg Illinois offices, however the Debtor primarily operates its day to day business from a leased facility located at 6601 Koll Center Pkwy, Suite 132, Pleasanton, California 94566.

---

[2] "Margin Share" individuals are not employees of Stratitude. For the most part, they came from Agama pursuant to the Agama APA, and were trained by Stratitude/Agama, but are now employed by new entities. Instead of paying these individuals as employees, Stratitude receives compensation (similar to a placement fee) from their new employer for work performed and revenue generated. The compensation received by Stratitude is essentially the margin on their billings billed to customers.

4.     The nature of Q4's business, and the factual background relating to the commencement of both of the Chapter 11 Cases are set forth in more detail in the *Declaration of Robert H. Steele in Support of Chapter 11 Petitions and First-Day Motions* (the "**Q4 Declaration**") filed on June 29, 2017, and incorporated herein by reference[3] [Q4 Docket No. 7]. For purposes of brevity and to the extent appropriate, certain of the matters mentioned in this Declaration will simply refer the reader to the Q4 Declaration.

5.     The resignation of Thondavadi and Desai (collectively, the "**Criminal Defendants**"), occurred less than one (1) month after a November 3, 2016 closing ("**Stratitude/Agama Closing**"), whereby: (a) Q4 acquired all of the issued and outstanding common stock of the Company pursuant to that certain Stock Purchase Agreement dated as of November 3, 2016 between "Stratitude, Inc. and The Shareholders of Stratitude, Inc.", as sellers, and Q4, as purchaser, for approximately $6.2 million (the "**Stratitude SPA**"); and (b) concurrently therewith and as a condition thereof, the Company acquired certain of the assets of Agama Solutions, Inc., a California corporation ("**Agama**"), pursuant to that certain Asset Purchase Agreement dated as of November 3, 2016 between Agama, as seller, and the Company, as purchaser (the "**Agama APA**", and together with the Stratitude SPA, the "**Stratitude/Agama Transactions**").

6.     The funding for the Stratitude/Agama Transactions came from loan arrangements dated November 3, 2016, which included a modification to Q4's July 2016 lending arrangement with BMO, and a new loan agreement in the principal amount of approximately $5,000,000 with BIP Lender, LLC, as agent for the BIP Quadrant 4 Debt Fund I, LLC, as junior subordinated lender to BMO ("**BIP Lender**" or "**BIP Loan**") (BMO and BIP Lender are collectively, the

---

[3]     Any capitalized terms not otherwise defined in this Declaration shall have the same meaning as ascribed in the Q4 Declaration.

"**Secured Lenders**"). A scant 3 weeks later, the Criminal Defendants were arrested and charged in the "Criminal Action"[4].

7.      Due to the turmoil caused by the Criminal Defendants and the filing of the Criminal Action, following my appointment as CEO of Q4, my primary activities were required to be devoted to stabilizing Q4 operations, further marketing efforts for Q4 and Stratitude, preparing for the resulting Q4 Chapter 11 Case and numerous ongoing matters therein. Although significant attention by me and other Q4 management and representatives was directed to the Company and its operations, Q4, as sole shareholder of the Company, did not formally address the election of a new Board of Directors or appointment of officers for the Company until the formal elections and appointments set forth below.

8.      By resolution dated August 31, 2017, Q4, as sole shareholder of the Company, adopted resolutions in lieu of a meeting in accordance with Section 603 of the California Corporations Code, electing Philip M. Firrek, Thomas E. Sawyer, Michael A. Silverman, and myself as the members of the Board. Concurrently therewith, the Board appointed me as the Company's sole officer as set forth above.

9.      In consideration of the additional responsibilities and obligations imposed on officers and directors of a corporation, especially, an insolvent corporation, and one preparing to

---

[4] On November 29, 2016, the Federal Government filed a criminal complaint against Messrs. Thondavadi and Desai (collectively, the "**Criminal Defendants**"), which matter is pending in the United States District Court for the Northern District of Illinois, Eastern Division, entitled *United States of America v. Nandu Thondavadi and Dhru Desai*, Case No. 16CR772 (the "**Criminal Action**"). The Criminal Action arises out of alleged violations of, inter alia, the federal securities laws and interstate wire laws, specifically alleging that Thondavadi and Desai violated Title 18, United States Code, §1343 (wire fraud), and Title 18, United States Code, §1350 (corporate officers' certification of financial reports that do not fairly present, in all material respects, the financial condition of the company), and also alleging that Thondavadi violated Title 18, United States Code, §1001 (false statements). To the best of my knowledge, information and belief, the Criminal Defendants remain, directly and/or indirectly, significant holders of Q4's publicly traded stock, and as given Q4's 100% ownership of the Debtor, may claim to have the legal right to replace the Board and me as the sole corporate officer, and take other action on behalf of the Debtor. Neither Q4 nor the Company are parties to the Criminal Action, although matters relating to Q4's acquisition of the Company and the Company's acquisition of certain of Agama's assets, might have been, and/or could be examined in connection therewith given the November 3, 2016 financing arrangements likely based on the same false and misleading information which, in part, forms the basis of the Criminal Action.

file a voluntary Chapter 11 case, in the exercise of the business judgment of the sole shareholder, and the Board (with each member abstaining as to themselves), with the consent of BMO, on or about September 22, 2017, Messrs. Firrek and Sawyer each received a payment of $35,000, in the form of a director's fee, in consideration of their acceptance of their positions on the Board, and I received a payment in the aggregate amount of $80,000 in consideration of my acceptance of a seat on the Board ($35,000) and my appointment as sole officer of the Debtor. In addition, I became a salaried employee of the Debtor, effective as of September 1, 2017.

10.     On October 19, 2017 (the "**Petition Date**"), the Debtor filed this voluntary case under Chapter 11 of the Bankruptcy Code in the above-referenced court. The filing of the Chapter 11 Case was authorized unanimously by the Debtor's Board. The Board is currently comprised of Messrs. Firrek, Sawyer, Silverman, and me.

11.     Subject to the qualifications below, I am familiar with the Debtor's prior and current day-to-day operations, business affairs, and books and records. I am the sole officer of the Debtor. I work closely with the other Board members, the Debtor's financial consultants, Silverman Consulting, Inc. (**"Silverman Consulting"**), and investment bankers, Livingstone Partners, LLC (**"Livingstone"**), and the Company's other key management personnel, including Mr. Sankaran, General Manager (his prior informal title was CEO), and Mr. Koduvayur V. Subramaniam, Operations Manager. Together, Messrs. Sankaran, Subramaniam and I comprise the management of the Debtor.

12.     My initial involvement with the Company began when I was appointed Chief Executive Officer of Q4 on or about December 12, 2016 following the resignations of the Criminal Defendants. As a wholly owned subsidiary of Q4, the operations of the Company fell within the purview of my responsibilities on behalf of Q4. Prior to my appointment as Q4's

CEO, I had no role in, or direct or indirect involvement with, the management or operation of the Company.

13.    In connection with the performance of my duties on behalf of Q4, my involvement in the Q4 Chapter 11 Case, and now as a member of the Board and sole officer of the Company, and from a review of various public filings (**"SEC Filings"**) made by Q4 with the SEC, and other books and records of the Company and Q4, I am generally familiar with the Debtor's history, current operational matters, and the events leading to the filing of the Chapter 11 Case; the existing indebtedness owing to the Secured Lenders; the proposed use of cash collateral; the Debtor's cash management system and employee wages, healthcare and other benefits; the Debtor's existing tax obligations; and the Debtor's proposed liquidation, marketing and sale efforts, all of which are the subjects of the various "first-day motions" filed in the Chapter 11 Case (collectively, the **"First-Day Motions"**, and individually, a **"First-Day Motion"**)[5] and motions to be filed in the first several weeks of the Chapter 11 Case. As a result of my familiarity with these matters, as well as my personal experience with the Debtor and its parent, Q4, and my more than 30 years of business experience, I have formed opinions regarding the necessity for the relief sought in the First-Day Motions, especially to the extent that such relief will enable the Debtor to continue to operate in the ordinary course of business as it pursues a strategy of the marketing and sale of the Debtor's assets and Business as going concerns.

14.    Since my appointment as CEO of Q4, I have also taken steps to examine the transactions leading up to the Stratitude/Agama Transactions. I have uncovered certain

---

[5] Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

irregularities relating thereto, which as CEO of Q4, and now the Company, I have attempted, and continue to attempt, to take steps to resolve in the best interests of the Company, its creditors and Q4 and its creditors and equity security holders.

15.     The actions of the Criminal Defendants which caused the filing of the Criminal Action, the "SEC Civil Action", as defined below[6], the Q4 Chapter 11 Case, have likewise caused the filing of this Chapter 11 Case. The combination of all such matters has left the Company with sizeable financial obligations which cannot be sustained by the Company's current operations without an infusion of a significant amount of new capital[7]. Given the circumstances surrounding the Company, I do not believe that obtaining new capital is a realistic alternative, and accordingly, the only practical means of proceeding is to market and sell the Company's assets and Business through the Chapter 11 sale process as expeditiously as possible.

16.     In light of the pending Criminal Action and SEC Civil Action, and other possible matters which may have led thereto, including the actions which led to the incurrence of the BIP Loan, the Stratitude/Agama Transactions, and the actions of the Criminal Defendants prior to their resignation on December 5, 2016, I am unable to represent or warrant that the information contained herein is complete or without any inaccuracy. However, significant effort has been made to reflect all information herein as completely as possible given the time constraints present, and current management's extremely recent and limited, or in most instances, complete

---

[6] On June 29, 2017, the U.S. Securities and Exchange Commission filed a civil complaint against the Criminal Defendants and Q4 in this District, as Case No. 17-cv-04883 ("**SEC Civil Action**"), and related motion for approval of a partial settlement between the Company and the SEC whereby Q4 consented to the entry of a partial judgment on a "no-admit, no-deny" basis, agreeing to refrain from violating various provisions of the federal securities laws. On September 28, 2017, the SEC obtained the entry of a final judgment in the civil suit, by agreement with Q4, whereby the prior preliminary injunctions were made permanent. In addition, the SEC stated its determination not to pursue a claim in the Q4 Chapter 11 Case in light of its liquidating nature. It is important to note that the SEC has not waived or released any such potential claims against Q4, but merely has decided at this time not to pursue same. The Company is not a party to the Criminal Action or the SEC Civil Action, and therefore does not believe either matter will impair its operations during the Chapter 11 process.

[7] As of the Petition Date, the principal balances owing to BMO and BIP Lender under their underlying loan documents are approximately $8,481,271.41 and $5,000,000, respectively, for a total of approximately $13,481,271.41, exclusive of interest, costs and fees.

lack of, involvement in the Debtor's past affairs. It is the intention of the Debtor's current management that further examination of the Debtor's books, records and past operating history will continue, and that such amendments to any and all documents filed in this Chapter 11 Case by the Debtor, including, without limitation, this Declaration, will be filed as and when appropriate, based upon such further examination.

17.    I have been authorized to, and hereby submit this Declaration in support of the First-Day Motions described below, as well as other motions and applications that the Debtor expects to file in the first several weeks of the Chapter 11 Case. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents and records of the Debtor, and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I am called upon to testify, I can and will testify to the facts and matters set forth herein to the best of my ability under the circumstances.

18.    As more fully described in the Q4 Declaration, and pursuant to the terms and conditions of the "BMO Forbearance Agreement", as defined therein, the marketing of the Debtor's assets and Business began before the filing of the Q4 Chapter 11 Case, and is continuing through the efforts of Livingstone and Silverman Consulting in order to maximize the value of the Debtor's assets in the best interests of all of the Debtor's creditors, Q4 and other interested parties.

19.    Being in the IT services industry, the Debtor's critical "assets" are its consultants (comprised of employees and independent contractors) who are billed out to clients. Most of the Company's consultants are readily employable given their technology skills and knowledge. The Debtor's customers include some of the biggest names in information technology industries. The



Debtor's customers and employees will not remain in place unless the Debtor is permitted to conduct an aggressive and expeditious marketing process to ensure that customers can continue to be serviced and employees will continue to have jobs. The Debtor continues to lose employees which it believes are being improperly solicited, but nonetheless departing. I believe that time is of the essence if the Debtor is to fully capitalize on the disposition of its assets. After lengthy negotiations with BMO, and with the knowledge of the BIP Lender, the Debtor was able to secure the Secured Lenders' consent to the Debtor's use of cash collateral with a view towards an orderly sale process. I further believe that the value of the Debtor's assets will quickly decrease unless there is a thorough and efficient marketing and sale process implemented immediately.

20.     For all of these reasons, the Debtor's ability to maximize the value of its assets for the benefit of its creditors is dependent on its ability to quickly and efficiently proceed with an orderly liquidation of its assets and businesses.

21.     To that end, after months of the marketing efforts described below, the Debtor has received an offer to purchase its assets and business in the amount of $1.5 million from FIRST TEK, INC., a New Jersey corporation, pursuant to that certain Asset Purchase Agreement dated October __, 2017, which will be the subject of the "Sale Motion", as defined below (the **"Proposed Stalking Horse Bid"**).

22.     To familiarize the Court with the Debtor, its business, the circumstances leading to the Chapter 11 Case, and the relief that the Debtor is seeking in the First-Day Motions, and those to be filed shortly thereafter, this Declaration is organized as follows: Part II of this Declaration provides a brief background of the Stratitude/Agama Transactions, including, some of the Company's and Agama's historical operating results, the apparent intended purpose of the

acquisitions, and post-closing disputes. Part III sets forth certain financial information concerning some of the Debtor's assets, liabilities and financial condition. Part IV sets forth a brief description of the marketing efforts which have been made to date for the solicitation of offers that the Debtor believes will form the basis for the Chapter 11 sale process. Part V sets forth the relevant facts in support of the Debtor's First-Day Motions, and the documents filed concurrently therewith. Part VI provides information with respect to certain additional pleadings that will be filed in the beginning of the Chapter 11 Case, but for which the Debtor will not seek the immediate entry of an order.

## II.    STRATITUDE/AGAMA TRANSACTIONS

### A.    Due diligence information leading to the Stratitude/Agama Closing

23.    According to a Limited Due Diligence Report dated June 30, 2016, and prepared for Q4 by the national full service accounting and advisory firm of Baker Tilly Virchow Krause, LLP in connection with the proposed Stratitude/Agama Transactions (**"Baker Tilly"** or the **"Baker Tilly Report"**):

> "Founded in 2006 in Fremont, California, the Company [Stratitude and Agama] specializes in building and maintaining custom computer programming services to maximize the efficiency between a company's business processes and its technology. The company is comprised of two separate entities: Stratitude and Agama. Stratitude offers specialized business process consulting to its customers, and Agama assists clients in leveraging their current information technology assets. Agama and Stratitude work together when clients have multidimensional requests that require the expertise of both the company's and Agama's consultants. Agama and Stratitude are separate S-corporations with common ownership and utilize the same accounting, finance and human resource employees. The Company had 190 IT consultants as of Jun-16."

24.    The operating results in the Baker Tilly Report were set forth on a consolidated basis for convenience of the reader, although Baker Tilly stated that Stratitude and Agama did

not report their financial statements on a consolidated report. As such, the Baker Tilly Report reported the following, among numerous other items (all <u>consolidated</u> numbers):

| *(in thousands)* | <u>TTM[8]16</u> | <u>FY15</u> | <u>FY14</u> | <u>FY13</u> |
|---|---|---|---|---|
| Net revenue[9] | $17,858 | $18,245 | $15,073 | $14,441 |
| Total Assets | $3,303 | $3,414 | $3,134 | $2,837 |
| Total Liabilities | $1,889 | $1,702 | $1,630 | $1,071 |
| Equity | $1,522 | $1,712 | $1,504 | $1,766 |

25.    The following operating results were reported <u>for Stratitude only</u> in the Baker Tilly Report, among numerous other items:

| *(in thousands)* | <u>June16</u> | <u>December15</u> | <u>December14</u> | <u>December13</u> |
|---|---|---|---|---|
| Net revenue | $6,094 | $6,165 | $3,592 | $5,384 |
| Total Assets | $1,452 | $1,308 | $ 951 | $1,051 |
| Total Liabilities | $ 988 | $ 871 | $ 673 | $ 384 |
| Equity | $ 464 | $ 536 | $ 277 | $ 667 |

26.    Exhibit A to the Stratitude SPA identifies the then shareholders of the Company as (**"Former Stratitude Owners"**): Ashish Sanan (**"Sanan"**) - 39.4%; Pankaj Kalra (**"Kalra"**) - 39.4%; and Sankaran - 21.2%. Sankaran served as the CEO of Stratitude, and Kalra was the CEO of Agama. I do not know if either of them had been formally appointed by Boards of Directors of Stratitude or Agama, nor do I know what individuals, if any, formally served on such Boards or as officers of Stratitude or Agama.

---

[8] Trailing Twelve Months (TTM) is a measure of a company's financial condition. It is calculated by using a company's income statements (whether interim, quarterly or annual reports), for the twelve-month period immediately prior to the date of such report.

[9] At the time of the Stratitude/Agama Transaction, total consolidated revenues were split approximately 33% Stratitude and 67% Agama.

**B.**     **Purpose of Stratitude/Agama Transactions (upon information and belief)**

27.     The purpose of the Stratitude/Agama Transactions appears to have been the continuation of the Criminal Defendants' prior strategy of growing Q4 through acquisitions. Stratitude was operating a staffing business similar to Q4's Legacy Staffing business unit, but was based in California and therefore had a West Coast customer base easier to solicit and service from a West Coast location.

28.     Agama had, and may continue to have, a minority business enterprise (**"MBE"**) certification given its ownership by Messrs. Kalra, Sanan and Sankaran.  Stratitude did not have an MBE certification.

29.     The Stratitude/Agama Transactions contemplated that Agama would transfer all of its billable human resources relating to its non-MBE business (**"Non-MBE Consultants"**) to Stratitude (approximately $10 million annually); retain its MBE billable human resources and customers (approximately $2 million annually); and have Stratitude provide all of the sales, general and administrative services Agama needed in exchange for which Agama would pay Stratitude a management fee. My subsequent investigation has shown that the calculation of Stratitude's management fees might have been set forth in an "additional agreement" whereby the management fee would be more or less equal to the profits Agama received from its MBE business.  Why Agama would have been interested in operating its business on only a break even basis is unknown.

30.     Given the consolidated revenues of Stratitude and Agama being around $18 million, the result would be to have Stratitude with some $16 million of annual revenues, and leave Agama with only its MBE related revenues of approximately $2 million per year.  Further,



Messrs. Kalra, Sanan and Sankaran would each sign a non-compete and non-solicitation agreement as a condition of the Stratitude/Agama Closing.

### C.    Financing of Stratitude/Agama Transactions

31.    To finance the Stratitude/Agama Transactions, Q4 entered into the $5 million BIP Loan, and also entered into that certain First Amendment to Credit Agreement with BMO Harris dated November 3, 2016, pursuant to which, among other things, the Debtor executed a Guaranty Agreement dated November 3, 2016 guaranteeing all of Q4's obligations under the BMO Loan, and to secure such guaranty, also granted a blanket lien in and to all of its assets in favor of BMO Harris. Similarly, the Company guaranteed all of Q4's obligations under the BIP Loan and secured such guarantee with a blanket lien on all of its assets, junior only to the liens granted BMO. In addition, BMO Harris and BIP Lender entered into that certain Intercreditor and Subordination Agreement dated November 3, 2016.

32.    To the best of my knowledge, information and belief, the Company utilized the proceeds of the BIP Loan to finance the Stratitude/Agama Transactions, with the exception of approximately $400,000, which upon information and belief, was wired to a bank account controlled by one of the Criminal Defendants at Fifth Third Bank. The funds are subject to litigation pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No, 17 CH 379. Approximately $6.5 million, including the BIP Loan proceeds, were paid to the Former Stratitude Owners. In turn, they were to retain approximately $4 million for their Stratitude stock, and remit approximately $2.5 million to Agama for the assets being acquired by Stratitude under the Agama APA.

### D.    Stratitude And Agama Dispute

33.     The primary assets transferred to Stratitude under the terms of the Agama APA were Agama's approximately seventy (70) Non-MBE Consultants and the related customer contracts (**"Non-MBE Contracts"**) (the Non-MBE Consultants and Non-MBE Contracts are hereinafter the **"Non-MBE Acquired Assets"**).

34.     In fact, at the Stratitude/Agama Closing, Agama only transferred around ten (10) of its Non-MBE Consultants, and kept the remaining 60 Non-MBE Consultants as its employees along with the Non-MBE Contracts relating to such individuals and revenues generated therefrom.

35.     It is unknown why all of the Non-MBE Acquired Assets, which were <u>fully paid for at the Stratitude/Agama Closing</u> were not immediately transferred to Stratitude by Agama. To the best of my knowledge, information and belief, Stratitude took no action following the Stratitude/Agama Closing and through the Criminal Defendants' December 5th resignation to demand or pursue the transfer of all of the Non-MBE Acquired Assets.

36.     Following the Stratitude/Agama Closing, Agama continued to conduct the business and collect the revenues generated by those Non-MBE Acquired Assets which it had failed to transfer at the Stratitude/Agama Closing. In addition to the commingling of physical operations, there was a commingling of financial transactions as well. Monies were commingled and used to pay Stratitude and Agama bills. Sankaran remained a signatory on the Stratitude bank accounts and Kalra on the Agama accounts.

37.     For a number of months following the placement of Q4's new management, Agama still failed to deliver all of the Non-MBE Acquired Assets to Stratitude, instead



transferring only around 5 Non-MBE Consultants and the attendant Non-MBE Contracts each month.

38.     As a result of an "all hands on deck" meeting, held in January 2017, attempting to identify all necessary resources to help stabilize Q4 and Stratitude, the Stratitude/Agama Transactions were reviewed based on the limited information available at that time. The question was whether to attempt to unwind the entire transaction, or segregate the businesses as they should have been following the Stratitude/Agama Closing. The Former Stratitude Stockholders were reminded that their non-compete and non-solicitation agreements remained in place and were considered keys to the success of Stratitude's operations.  Given the costs and delays in making any attempt to reverse the acquisitions, the decision was made to have Stratitude operate as an independent subsidiary of Q4 and attempt to unwind Stratitude and Agama as soon as practicable to allow Q4 to maximize the value of the recently closed transaction.  Given his relationship to, and knowledge of, Stratitude's Business, it was concluded that all of the Stratitude business operations would proceed primarily under the direction of Sankaran, one of the Former Stratitude Stockholders. At the same time, Q4's new management, including myself, began to examine the failure of Agama to transfer all required Non-MBE Acquired Assets. I made several trips to the Stratitude and Agama offices to try and understand all of the operational issues of both companies. These examinations were difficult as we were all largely consumed by Q4 operating issues, Secured Lender negotiations, Q4 employee and customer fallout from the Criminal Defendants' arrests and the filing of the Criminal Action, and preparing for the Q4 Chapter 11 Case.

39.     As Q4 operational and managerial issues began to be stabilized, I turned my attention to the problems arising from Agama's failure to transfer all necessary assets at the

Stratitude/Agama Closing and made additional trips to the Stratitude and Agama offices to examine the continued operation of the business generated by such assets that rightfully belonged to Stratitude.

40.     Unable to obtain satisfactory responses or actions from anyone, on or about May 15, 2017, I sent Mr. Dirk Heitzman, Q4's Vice President, Managed Services, to Stratitude's California offices to conduct a detailed examination of the situation and try to unravel the ongoing physical and financial commingling between Stratitude and Agama.

41.     All told, after about 10 work weeks of dedicated efforts, Mr. Heitzman was able to determine in large part, what needed to occur to undo the improper commingling which had existed, and take steps to accomplish this task[10]. Fully completing these efforts were a time consuming, complicated and difficult task.

42.     As of the Petition Date, the physical separation of Stratitude and Agama personnel and operations was completed. Q4 has completed its analysis of the financial separation, through the efforts of Silverman Consulting, and has determined that the net amount which Agama owes Stratitude is approximately $840,000 at a minimum, largely representing the income net of associated expenses Agama derived from failing to transfer all Non-MBE Acquired Assets to Stratitude at the Stratitude/Agama Closing, plus to a smaller extent, some balance sheet items not delivered (collectively, the **"Stratitude Claim"**). Stratitude has demanded Agama remit such sums, however, as of the Petition Date, Agama has refused to do so and contests the amount of the Stratitude Claim.

43.     In addition to the Stratitude Claim, I am concerned that there may have been violations of non-solicitation covenants agreed to by one or more of the Former Stratitude

---

[10]Following Mr. Heitzman's first visit on May 15, 2017 which last about one work week, he made an additional six (6) trips to the California offices through early September, each also lasting approximately one work week.

Shareholders and/or Agama under the Stratitude SPA and Agama APA insofar as a number of

the Non-MBE Consultants have left Stratitude as a direct or indirect result of possible improper

third party actions. Together with other Q4 representatives, I am examining such matters. It is

my intent that all such disputes will be addressed during the Chapter 11 Case[11].

44.     With the assistance of Silverman Consulting, I have also examined, and will

continue to examine, all material intercompany transactions between the Company and Q4.

## III.     ASSETS, LIABILITIES, AND FINANCIAL CONDITION[12]

45.     As of October 12, the Company's assets consist primarily of: (a) accounts

receivable of approximately $1,003,881; (b) 41billable consultants; and (c) approximately

thirty-four (34) ongoing customer contracts. At present, and based on current business levels,

the Company's projected annual net revenues are running at around $8.7 million. Given the

continuing and significant uncertainties facing the Company, both as a result of the Chapter 11

Case, and any ongoing actions of third parties to, directly or indirectly, improperly solicit the

Company's employees to terminate their employment, I am unable to ascertain if the

Company's revenue levels will decline in any material fashion before the Company's assets can

be sold through a Section 363 sale and bidding process.

46.     The Debtor's liabilities as of the Petition Date primarily consist of the

aforementioned $13,481,271.41 owing to the Secured Lenders, exclusive of attorneys' fees,

interest, and other charges payable under the applicable loan documents, which continue to

---

[11] For example, the projected non-MBE annual revenues of $16 million which evidently prompted the purchase price of $6.2 million, are currently less than $8 million. The Debtor believes this significant decline which will in turn adversely impact the Company's sale price in the Chapter 11 Case, is due in large part to actions, directly or indirectly, involving Agama and one or more of the Former Stratitude Stockholders.

[12] As noted above, in light of the events leading to, and following, the Stratitude/Agama Closing, current management is unable to verify the accuracy of the Company's books and records. The Company's new management, with the assistance of Silverman Consulting, is continuing to work diligently to determine a reasonably accurate determination of the company's assets, liabilities and financial transactions. As such, there can be no assurance that such updated financial statements can be prepared to any reasonable degree of accuracy. In light of the Company's limited resources, it has not engaged a forensic accounting firm.

accrue. The Company is analyzing various UCC code, pending lawsuit and judgment, and tax lien searches in California to determine the existence of any further liens that could represent additional secured indebtedness.

47.     Prior to the Petition Date, the Debtor has remained current on all of its customary and ordinary wages and trade debt incurred in the ordinary course of the Debtor's Business, however the timing of the filing of the Chapter 11 Case, as with any Chapter 11 filing, will result in certain of these obligations remaining outstanding as of the Petition Date. It is estimated that excluding all amounts owing to employees, which will be the subject of First Day Motions, the Debtor have less than 60 general unsecured creditors (including unsecured claims entitled to priority under the Bankruptcy Code), consisting of regular suppliers, trade creditors, taxing authorities, utilities, professional service firms, real estate and equipment vendors, and obligations owing the Former Stratitude Stockholders for earn-out claims under the Stratitude/Agama Transactions.

48.     All told, as of September 30, 2017, the Debtor's books and records, as reconstructed to the extent practicable by the Debtor's accounting staff and Silverman Consulting, reflected the total unsecured payables of approximately $319,707.[13]

49.     The Debtor is a party to various leases and executory contracts in conjunction with its day-to-day operations[14]. These include: (a) the office lease for the Pleasanton California facility; (b) equipment leases; (c) vendor contracts; (d) agreements for licenses of intellectual property, as licensee; (e) employment agreement and independent subcontractor contracts; (f) vendor contracts; (g) insurance agreements for director and officer liability coverage; health

---

[13] Subject to the resolution of claims for leases and executory contracts.
[14] The Debtors are in the process of analyzing the Debtor's various agreements for use of personal property to determine if they are executory or non-executory. Any references herein to "executory" are not intended as a legal determination by the Debtor.

plan administration, liability, casualty and workers compensation; and (h) contracts for
telephone, internet, and other utilities.

## IV.   MARKETING EFFORTS

50.    The marketing efforts of the Debtor's assets were combined with the marketing
efforts as set forth in the Q4 Declaration. Following the commencement of the Criminal Action,
the resignation of the Criminal Defendants, and BMO's declaration of default, Q4's management
recognized that the Company's only realistic alternative to address its creditors' claims to the
extent practicable would require the Company to solicit offers to purchase its Business.

51.    In anticipation of filing the Chapter 11 Case, and in connection with the
marketing efforts described above, the Debtor authorized its insolvency counsel to prepare
sample asset purchase agreements to be included in the Livingstone online data room for review
by prospective purchasers as they conducted their due diligence.  The purposes of this was to
facilitate the submission of written offers from which the Debtor and its professionals could
analyze possible stalking horse bids to be proposed as part of the "Sale Motion", as defined
below.

52.    In the weeks leading up to the filing of the Chapter 11 Case, the Debtor and its
professionals have reviewed, negotiated and revised several different versions of asset purchase
agreements submitted by two different parties for the Business.

53.    As stated above, as of the date hereof, the Debtor, in consultation with
Livingstone, Silverman Consulting and BMO, has determined that the Proposed Stalking Horse
Bid is the highest and best offer received to date and will be the subject of the Sale Motion. The
Debtor has received the necessary earnest money deposit thereunder, which monies are being

held in an IOLTA trust account at JPMorgan Chase Bank, N.A. maintained by the Debtor's

counsel, Adelman & Gettleman, Ltd. (**"A&G"**).

54.     In light of the foregoing, the Debtor desires to move expeditiously with an orderly

marketing and sale process under Sections 363 and 365 of the Bankruptcy Code.  Such orderly

sale process is intended to maximize the recovery on the Debtor's assets for the benefit of its

creditors, employees, Q4 and other interested parties.

55.     The Debtor's declining sales, a continuing departure of key sales and client

management resources, and dwindling operating resources will necessitate a prompt and efficient

marketing and sale process in order to maximize the value of the Debtor's Business and preserve

customer retention.

56.     In order to enable the Debtor to operate efficiently and to avoid the adverse

effects that the Chapter 11 Case might otherwise have on its business while it undertakes the

sales, the Debtor has requested various types of relief in the First-Day Motions filed with this

Court on or the day following the Petition Date.

## V.     **FIRST-DAY MOTIONS**

57.     A critical element in the Debtor's attempt to maximize the benefits of the Chapter

11 Case for its creditors and other interested parties is the approval of each of the Debtor's First-

Day Motions submitted concurrently herewith.  Based on my personal knowledge and the review

discussed above, I believe that the relief sought by the Debtor in the First-Day Motions is

necessary to enable the bankruptcy estate to be administered effectively and to give the Debtor

its best chance to effect a sale process that will maximize the value of the estate for the benefit of

all parties.



58.     Failure to grant such relief would have a serious negative effect on the Debtor's efforts to continue operating during the Chapter 11 Case.  For example, the Debtor must utilize cash collateral to maintain its business operations and retain asset values to sell.  The inability to access postpetition financing and pay ordinary course business expenses will result in substantial and irreparable harm to the value of the Debtor's assets and would otherwise not be in the best interests of the Debtor's estate and creditors.

59.     Factual information in support of the First-Day Motions is provided below and in the corresponding motions filed concurrently herewith.

### A.     Cash Collateral

60.     With the assistance of Silverman Consulting, and with the consent of BMO, the Debtor has determined that it can finance its operations during the Chapter 11 Case by the use of cash collateral (**"Cash Collateral"**), without the need for debtor in possession financing.  The use of the Cash Collateral is imperative for an orderly sale process, as it will allow the Debtor to maintain its operations in the ordinary course.  This simply would not be possible without BMO's consent to use the Cash Collateral.

61.     By its motion for authority to use of cash collateral (the **"Cash Collateral Motion"**), the Debtor seeks approval of, among other things, the use of the Cash Collateral of the Secured Lenders, as set forth in that certain Interim Order (as defined in the Cash Collateral Motion) The relief requested in the Cash Collateral Motion is critical to ensuring the certainty that the Debtor will have sufficient liquidity throughout the duration of the Chapter 11 Case.

62.     The Debtor's management, with the assistance of Michael A. Silverman, Hassaan Mansoor and other Silverman Consulting personnel, reviewed and analyzed the Debtor's anticipated cash needs and prepared a 13-week projection (as updated from time to time in



accordance with the agreement between the Debtor and BMO, the "**Budget**") outlining the Debtor's postpetition cash needs in the initial 13 weeks of this Chapter 11 Case. The Debtor believes that the Budget is an accurate reflection of its funding requirements over the identified period, will allow it to meet its obligations – including the administrative expenses of the Chapter 11 Case – and is reasonable and appropriate under the circumstances.

63.     Based on this forecast, the Debtor determined that it would require the use of the Cash Collateral to provide sufficient liquidity to efficiently administer the Debtor's estate during this Chapter 11 Case. Among other things, the Debtor needs such liquidity to satisfy payroll, pay its taxes, and make other payments that are essential or appropriate for the operating of its business and efficient administration of the Debtor's estate. The Debtor's ability to continue making such payments during the Chapter 11 Case is essential to the preservation of its assets during the pendency of this Chapter 11 Case.

64.     The Debtor requires interim approval for the use of the Cash Collateral to meet its post-petition obligations that will become due before any final order can be obtained.

65.     Accordingly, without the immediate relief requested in the Cash Collateral Motion, I believe that the Debtor faces a material risk of substantial, irreparable, and ongoing harm. Access to the Cash Collateral should ensure the Debtor has sufficient funds to preserve and maximize the value of its assets, and responsibly administer the Chapter 11 Case.

66.     The Debtor does not have sources of financing readily available. All of the Debtor's assets are encumbered under the BMO Loan and the BIP Loan. The circumstances leading up to the filing of the Chapter 11 Case in the form of the Criminal Action, the Debtor's uncertain financial condition, and lack of reliability in the Debtor's financial statements, have eliminated the Debtor's ability to obtain postpetition funding.  As a result, the Debtor does not

believe third-party DIP financing would be reasonably obtainable and the only means of accessing cash to run its operations and fund the Chapter 11 Case is through use of Cash Collateral.

67.     For all of the foregoing reasons, I believe that the use of the Cash Collateral under the Interim Order is reasonable, appropriate, in the Debtor's best interests, and will enable the Debtor to preserve and maximize the value of its estate upon the best terms presently available to the Debtor.

**B.     Cash Management**

68.     The Debtor has requested the authority to: (a) maintain and continue to use, with the same account numbers, all four (4) of the "Bank Accounts" in its "Cash Management System" (as those terms are defined in the underlying motion); (b) treat the Bank Accounts for all purposes as accounts of the Debtor as a debtor in possession; (c) open new debtor-in-possession accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtor's status as a debtor in possession (the **"Cash Management Motion"**).

69.     The Debtor's Cash Management System is now managed by responsible individuals under my direction, and generally works as follows: The Bank Accounts are comprised of a collections account (the **"Collections Account"**) maintained at BMO; a payroll account (the **"Payroll Account"**) and an operating account (**"Operating Account"**) both maintained at Freemont Bank; and a disbursements account maintained at Bank of America, N.A. (the **"Disbursement Account"**) used for automated ACH withdrawals for service providers, utilities and other creditors. The Debtor uses funds received in the Collections

Account and the Operating Account to fund disbursements. The Payroll Account can be debited directly by ADP, LLC ("**ADP**"), the Debtor's payroll processor, to fund the Debtor's payroll obligations.

70.     The same reasons for the relief sought in the similar motion filed in the Q4 Chapter 11 Case apply equally, and the Debtor will utilize the same type of safeguards as are being utilized in the Q4 Chapter 11 Case, and which have been approved by the Court.

71.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estates, creditors, and all other parties in interest, and will enable the Debtor to efficiently administer its estate in the Chapter 11 case without disruption.

### C.     Prepetition Wages, Benefits and Insurance Coverage

72.     The Debtor requests authority to: (a) pay pre-petition wages, salaries, wage-related benefits, other compensation, and reimbursable employee expenses; and (b) continue employee benefits programs in the ordinary course, including payment of certain pre-petition obligations related thereto (the "**Wages/Benefits Motion**"). As discussed herein, the Debtor's critical "assets" include their employees, who are readily employable and can find jobs at other employers given their specialized skills, knowledge and degrees.  Indeed, many employees work directly at client locations.

73.     I understand and believe that the description of the "Prepetition Wage Claims" (as defined in the Wages/Benefits Motion), benefits and related employee obligations discussed herein and further set forth in detail in the Wages/Benefits Motion is accurate.

74.     There exists a critical need for the Debtor immediately to pay certain prepetition wage and benefit claims of each of the Debtor's employees, including outstanding wages and wage-related benefits, all related withholdings and taxes, accrued reimbursable business

expenses and prepetition claims arising in connection with the Debtor's employee health (including prescription drug, dental and vision care), disability, and life insurance (collectively, the "**Prepetition Employee Obligations**"). The satisfaction of these Prepetition Employee Obligations is critical to the Debtor's ability to retain qualified employees to continue to operate its business for the benefit of all creditors and other interested parties in the Chapter 11 Case. As noted above, as of the Petition Date, the Debtor employs approximately forty-seven (47) employees, all of whom work at least 40 hours per week.

75.    In total, as of the Petition Date, the Debtor estimates that approximately $237,614 in Prepetition Wage Claims are owed to the employees, approximately $20,000 in employer and employee federal, state and local withholding and payroll-related taxes relating to prepetition periods, and approximately $15,000 in reimbursable business expenses incurred prepetition (which is the approximate monthly average of such expenses). These estimated amounts are included in anticipated disbursements allocated in the Budget, which is an exhibit to the Interim Order. In addition, in the Debtor requests in the Wages/Benefit Motion to allow their employees with "cash out" of their respective accrued paid vacation, which consistent with the Debtor's prepetition course of business, can be carried over year to year, and may be "cashed" by an employee if not taken. Such cash will be strictly limited to the extent that such amount, combined with the respective employee's Prepetition Wage Claim, does not exceed the $12,850 limit for wages provided under Sections 507(a)(4) of the Bankruptcy Code, except as otherwise expressly noted in such motion.

76.    The Debtor self-insures its employees' health insurance. The Debtor intends to maintain existing health, dental, life, disability, and worker's compensation insurance coverage (collectively, the **"Employee Insurance Benefits"**) for its employees during the pendency of the

Chapter 11 Case. Employees may enroll in a health insurance plan (for themselves, spouses and dependent children), for which the Debtor pays a percentage of the premium, depending on the length of employment. On average, an Employee will pay 50% of the premium through payroll deductions. Participating employees also receive prescription drug, dental and vision care coverage.

77.     The Debtor's employee health insurance program is administered by CIGNA, for a monthly fee of approximately $33,000 ($30,000 for medical claims and $3,000 for administration fees). There is a cap on payment of claims per employee of $125,000 and total claim exposure to the Debtor of $360,000 per year ($30,000/month). So for example, if total claims for a month are $40,000, the Debtor pays $40,000 and is reimbursed $10,000 from the reinsurance coverage. The Debtor believes it will receive between $35,000 - $65,000 of reimbursement payments for 2016 claims prior to the end of this year.

78.     The Debtor believes that, as of the Petition Date, all premiums for Employee Insurance Benefits were fully paid, although there may be wire transfers for such payments not yet fully processed.

79.     To the extent there are any claims relating to Employee Insurance Benefits which arose prior to the Petition Date and remain unpaid, the Debtor requests authority to pay such claims, consistent with and in the ordinary course of its business. For example, while claims for health insurance average $25,000 per month, given the lag time that occurs in the time for submission of such claim, the Debtor seeks to pay any health insurance coverage obligations that arose prepetition even in the event such amounts exceed the statutory limits provided in section 507(a)(5) of the Code.

80.    The Debtor believes that the payment of the foregoing sums, and the continuance of all other employee benefit programs (e.g., its 401(k) plan and FSA program, as detailed in the Wages/Benefit Motion), are both critical to retaining its employees in order to effectuate an orderly sale of the Debtor's Business in the Chapter 11 Case.  No employees shall be paid salary, wage or vacation benefits in excess of the $12,850 limit for wages provided under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

### D.    Obligations to the U.S. Department of Homeland Security and other federal government agencies related to foreign worker authorizations

81.    The Debtor requests authority, in its sole discretion, to pay or honor prepetition obligations to the U.S. Department of Homeland Security or other federal government agencies related to foreign worker authorizations (the "**Foreign Work Authorizations Motion**") on the same basis, and for the same reasons, as set forth in the Q4 Declaration.

82.    I believe that the relief requested in the Foreign Work Authorizations Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to maintain its employees and thus continue to operate its business in the Chapter 11 Case without disruption.  Moreover, I understand that as of the Petition Date the outstanding amount of fees incurred but not paid (all in the form three (3) paper checks not cashed by the U.S. Department of Homeland Security) totaling approximately $1,460.

### E.    Extension of time to file Bankruptcy Schedules/Statement of Financial Affairs

83.    The Debtor requests the extension of the time within which it must file its Bankruptcy Schedules ("**Schedules**") and Statement of Financial Affairs ("**SOFA**") under Bankruptcy Rules 1007(a)(1) and (c) ("**Extension Motion**").  The Debtor's affairs are very complex and an analysis of a significant amount of information from numerous documents and books of account will be required to complete the Schedules and SOFA in as thorough a manner



as practicable, especially in light of the matters which are the subject of Stratitude/Agama

Transactions, the Criminal Action, and the implications concerning the Debtor's books and

records.

84.     The Extension Motion proposes an extension of time which will still permit the

Schedules and SOFA to be completed before the scheduled first meeting of creditors to be held

in the Chapter 11 Case under Section 341 of the Bankruptcy Code.

85.     I believe that the relief requested in the Extension Motion is in the best interests

of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to

prepare the Schedules and SOFA in as accurate and thorough a manner as is practicable under

the circumstances, and provide the Court, U.S. Trustee's office and all creditors and their

representatives with detailed and sufficient information which in turn, should help enable the

Chapter 11 Case to proceed smoothly.

**F.      Motion to Reject Lease**

86.     As a part of the Stratitude/Agama Transactions, and on or about September 27,

2016, the Debtor, Agama, and Murco Plaza (the **"Landlord"**) entered into that certain First

Amendment to the existing lease which removed a prior lessee and added the Debtor as a joint

lessee with Agama (collectively, the **"Lease"**). By its terms, the Lease's expiration date is

October 31, 2019, with monthly base rent of $13,673.00 between December 1, 2016 and

September 30, 2017, $14,043.00 between October 1, 2017 and September 30, 2018, and

$14,412.00 between October 1, 2018 and October 31, 2019.

87.     The leased premises were contemplated to be used, jointly, by the Debtor and

Agama as training facilities for their employees and consultants. After the closing of the

Stratitude/Agama Transactions and, subsequently, the physical separation of Stratitude and

Agama personnel and operations, the Debtor ceased all use and occupancy of the Leased Premises as of June 30, 2017. As of the Petition Date, the majority of the Debtor's day-to-day operations are conducted from a leased facility located at 6601 Koll Center Pkwy, Suite 132, Pleasanton, California 94566 (the "**Pleasanton Facility**").

88. I believe that the rejection of the Lease is in the best interests of the Debtor's creditors and estate. The Debtor has ceased any and all occupancy or use of the leased premises as of June 30, 2017. As of the Petition Date, day-to-day operations of the Debtor, including those that would have otherwise been conducted at the leased premises, are conducted at the Pleasanton Facility. Therefore, the leased premises are of no further use to the Debtor and the Lease constitutes a burden on the Debtor's estate. Accordingly, I believe that it is in the best interests of the Debtor's estate to reject the Lease. Accordingly, the Debtor seeks to reject the Lease, retroactively effective as of the Petition Date.

### G.   **Critical Vendor Motion**

89. Many of the services rendered to the Debtor's customers are by third party contractors who are akin to employees of the Debtor. The customers pay the Debtor for the services rendered (usually between thirty (30) and sixty (60) days in arrears), and the Debtor then remits payment to the vendors, retaining a marginal profit.

90. The Debtor has identified ten (10) such contractors currently rendering services on behalf of the Debtor to its customers (the "**Critical Vendors**") that are vital to maintaining the Business. The Critical Vendors render services and are entitled to periodic payments from the Debtor pursuant to various Independent Contractor Services Agreements. The revenues earned by the Debtor for services performed by the Critical Vendors account for approximately twenty percent (20%) of the Debtor's total revenue.

91.  The Debtor requires authority to pay the prepetition claims of the Critical Vendors in the estimated amount of $246,573.00 because their services are essential to the Debtor's continued operations. The Debtors seek to pay these claims pursuant to the narrowly tailored "Critical Vendor Program" (detailed in the motion) that would allow payment to the Critical Vendors if, and only if, the Critical Vendors are placed at their respective job assignments for the Debtor and rendering services to the customers on the earlier of either: (a) ninety (90) after the Petition Date, or (b) the closing date of a sale of substantially all assets of the Debtor.

92.  I believe that the failure to timely obtain authority to pay the prepetition claims of the Critical Vendors (pursuant to the Critical Vendor Program) will immediately and directly cause the Critical Vendors to cease rendering services to the Debtor's customers. The Critical Vendors are comprised of individuals with highly specialized knowledge and skillsets, making them readily employable. Further, the Independent Contractor Services Agreements which govern the relationship between the Debtor and the Critical Vendors as "at-will" agreements and do not bind the Critical Vendors to continue rendering performance.

93.  The only rational basis for the Critical Vendors to continue to render services for the benefit of the Debtor is the timely receipt of compensation for the same. The Critical Vendors are not in any way reliant on the Debtor beyond each monthly payment they receive from it, and may readily find employment elsewhere.

94.  The prepetition claims at issue relate to services rendered by the Critical Vendors which account for approximately $275,000 in gross revenue to the Debtor. Additionally, the continued services to be rendered by the Critical Vendors, post-petition, will garner approximately $120,000 gross revenue, per month, for the estate.

95.     If the Critical Vendors cease rendering services, the Debtor will lose its customers
and the customers will likely cease remission of payments to the Debtor. This will result in a
drastic reduction of the Debtor's revenues as well as its going concern value and severely
hamper the Debtor's efforts to sell substantially all of its assets to the Proposed Stalking Horse
Bid or other higher qualified bids which may be solicited through a marketing and sale process.
Therefore I believe the Critical Vendor Program should be implements so that the Debtor's estate
and the interests of its creditors can realize the full going concern value of the Business and
complete a sale of same.

## VI.    MOTIONS TO BE FILED ON OR SHORTLY AFTER PETITION DATE[15]

96.     In addition to the First-Day Motions, the Debtor will be requesting other relief
shortly following the Petition Date.

### A.    Sale Motion[16]

97.     As mentioned, the success of the Debtor's Business is largely based on
maintaining the Debtor's highly skilled employee, independent contractor and third party
subcontractor workforce (collectively, the **"Workforce"**) and maintaining customer
relationships. Because of the technology skills held by a majority of the Workforce, these
individuals are readily employable. Much of the Workforce is dedicated to a particular
customer, making the individual even more employable, often directly by that customer. Absent
a prompt resolution of the Debtor's financial difficulties in maintaining the viability of the
Business, many in the Workforce will seek, and likely obtain, pother jobs, leaving the Debtor
with insufficient human resources to service its customers.

---

[15] The motions described herein are not intended as an exhaustive list of motions to be filed following the Petition Date.
[16] Given the time urgencies facing the Debtor, it is anticipated that the Sale Motion will be filed on or within the first week of the Chapter 11 Case.

98.     The Debtor's ability to maintain the Debtor's customer relationships and
contracts, retain the Workforce, and maximize the value of its assets is dependent on the
Debtor's ability to quickly and efficiently proceed with an orderly liquidation of its assets and
businesses pursuant to a Court approved Section 363 sales and bidding process.

99.     To implement the necessary sale and bidding process, the Debtor has been
negotiating with prospective bidders to become stalking horse bidders in order to commence a
Section 363 sale process, and to that end, has obtained the Proposed Stalking Horse Bid for the
Business.

100.     The Debtor will request the entry of an order authorizing the Debtor to enter into
the Proposed Stalking Horse Bid, approving bid protection and break-up fees, scheduling a
public auction and subsequent sale hearing, authorizing the sale of the assets of the debtor free
and clear of liens, claims, encumbrances and interests; authorizing the assumption and
assignment of executory contracts and unexpired leases; and approving the form of notice and
manner of notice of sale hearing and proposed assumption and assignment as soon as is
practicable after the commencement of the Chapter 11 Case (**"Sale Motion"**).

101.     I believe that proceeding with the Sale Motion immediately after filing the
Chapter 11 Case is imperative to the success of the Debtor's efforts herein.

**B.     Retention of Professionals**

102.     In light of the related nature of the Q4 Chapter 11 Case, the Debtor intends to
seek the retention of the following professionals in this Chapter 11 Case, all of whom were also
retained by Q4 in the Q4 Chapter 11 Case, and believed by the Debtor to be well qualified to
serve in their respective roles: (a) A&G - insolvency and restructuring; (b) Livingstone -
investment bankers; (c) Silverman Consulting - financial consultants; (d) Michael A. Silverman

(a member of Silverman Consulting and a member of the Debtor's Board of Directors) - Chief
Restructuring Officer; and (e) Nixon Peabody, LLP - special counsel for matters arising during
the Chapter 11 Case concerning taxes, labor, ERISA, securities compliance, international law,
and other areas outside of the expertise of A&G. The Debtor will not seek the retention of special
counsel for securities litigation matters as it does not believe such services are needed by the
Debtor.

C.    <strong><u>Utilities</u></strong>

103.    The Debtor will request the entry an order authorizing payment of deposits as
adequate assurance of payments for utility services, and prohibiting the utility company(s) from
altering, refusing to provide, or discontinuing the utility services, or discriminating against the
Debtor solely on the basis of the commencement of the Chapter 11 Case or on account of any
unpaid invoice for services provided prior to the Petition Date (the "**Utilities Motion**"). During
the time it takes the Debtor to sell the assets of its business, it is important that utilities services
continue uninterrupted. I believe that the Debtor's proposed procedures governing the utility
companies' requests for adequate assurance are appropriate in the Chapter 11 Case. I believe that
the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its
creditors, and all other parties in interest, and will enable the Debtor to continue to efficiently
administer the Chapter 11 Case without disruption.

**VII.   <u>CONCLUSION</u>**

104.    In order to minimize any loss to the value of the Debtor's assets and to maximize
the benefit to the Debtor's creditors and estate, the Debtor's immediate objective is to
immediately undertake a marketing and sale process of the Debtor's assets and Business, all of
which the Debtor believes have meaningful value. I believe that if the Court grants the relief

requested in each of the First-Day Motions and other motions to follow, the prospect of achieving such objectives, and thus maximizing the recovery for the Debtor's estate and creditors, will be significantly enhanced.

Dated: October 13, 2017

_____
ROBERT H. STEELE