**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QUADRANT 4 SYSTEM CORPORATION, *et al.*, | ) | Case No. 17-19689 |
| | ) | |
| | ) | Honorable Jack B. Schmetterer |
| Debtors. | ) | |
| | ) | **Re: Docket No. 23 [Case No. 17-30724]** |
| | ) | |

**FINAL ORDER (I) AUTHORIZING STRATITUDE, INC.'S
USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND
(II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363**

Upon the motion (the "Motion") of Stratitude, Inc. (the "Debtor") (a) seeking this Court's authorization pursuant to Section 363(c) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), for the Debtor to, inter alia, use "Cash Collateral" (as defined below) on an interim basis (the "Interim Relief") and, pursuant to Bankruptcy Code §§ 361 and 363(e), provide adequate protection to BMO Harris Bank, N.A. (the "Lender") and BIP Lender, LLC ("BIP") with respect to any diminution in the value of the Lender's and BIP's interests in the Cash Collateral resulting from (i) the use of Cash Collateral, (ii) the use, sale or lease of the "Pre-Petition Collateral" (as defined below) (other than Cash Collateral) and (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a); (b) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001; and (c) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order (this "Order") authorizing on a final basis, inter alia, the use of Cash Collateral; the Final Hearing having been held before this Court;

due and sufficient notice of the Motion and the Final Hearing under the circumstances having been given; and upon the entire record made at the Preliminary Hearing, which was held on October 19, 2017, October 20, 2017, and October 31, 2017, and the Final Hearing; and the Court having entered an order granting the Motion on an interim basis (the "First Interim Order") [Docket No. 41; Case No. 17-30724] on October 20, 2017 and an amended order granting the Motion on an interim basis (the "Second Interim Order," and together with the First Interim Order, the "Interim Orders") [Docket No. 47; Case No. 17-30724] on November 2, 2017; and this Court having found good and sufficient cause appearing therefor,

THE DEBTOR AND THE LENDER STIPULATE AND THE COURT FINDS AND CONCLUDES THAT:

A.      On October 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code (this "Chapter 11 Case"). The Debtor is continuing in possession of its property, and operating and managing its business as a debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.      On July 6, 2017, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Quadrant 4 Bankruptcy Case.  On October 24, 2017, the Office of the United States Trustee filed an amended Notice of Appointment of Official Unsecured Creditors' Committee in the jointly administered bankruptcy cases [Docket No. 195].

C.      This Court has jurisdiction over this Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

CHICAGO/#3058682.2; #897579v1

D.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that from time to time prior to the Petition Date, the Lender loaned money to or for the benefit of the Debtor's owner and parent corporation, Quadrant 4 System Corporation ("Quadrant 4"),[1] pursuant to the terms and conditions of (a) that certain Credit Agreement, dated as of July 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement") by and between Quadrant 4 and the Lender; (b) that certain First Amendment to Credit Agreement, dated as of November 3, 2016 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement Amendment") by and among Quadrant 4, the Debtor and the Lender; (c) that certain General Security Agreement, dated as of July 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "Borrower Security Agreement") by and between Quadrant 4 and the Lender; (d) that certain Amendment No. 1 to General Security Agreement, dated as of November 3, 2016 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement Amendment") by and among the Debtor, Quadrant 4 and the Lender; (e) that certain General Security Agreement, dated as of November 3, 2016 (as amended, supplemented or otherwise modified from time to time, the "Guarantor Security Agreement") by and between the Debtor and the Lender; (f) that certain Revolving Note, dated as of July 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "Revolving Note") by Quadrant 4 in favor of the Lender in the original principal amount of $7,000,000.00; (g) that certain Term Note, dated as of July 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "Term Note") by Quadrant

---

[1] On June 29, 2017, Quadrant 4 filed a voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code, commencing the case captioned as *In re Quadrant 4 System Corporation*, Case No. 17-19689 (the "Quadrant 4 Bankruptcy Case").

4 in favor of the Lender in the original principal amount of $13,000,000.00; (h) that certain CapEx Software Note, dated as of July 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "CapEx Note," and collectively with the Revolving Note and Term Note, the "Notes") by Quadrant 4 in favor of the Lender in the original principal amount of $5,000,000.00; (i) that certain Guaranty Agreement (as amended, supplemented or otherwise modified from time to time, the "Guaranty") by the Debtor in favor of the Lender; (j) that certain Forbearance Agreement effective as of March 17, 2017, by and among Quadrant 4, the Debtor and the Lender, and (k) as further documented, recorded and evidenced by various other agreements, instruments, financing statements and documents in connection therewith and with the prepetition financing arrangements from the Lender to Quadrant 4 (in each case, as amended, restated, supplemented or otherwise modified from time to time, and collectively with the Credit Agreement, the Credit Agreement Amendment, the Borrower Security Agreement, the Security Agreement Amendment, the Guarantor Security Agreement, the Notes and the Guaranty, the "Pre-Petition Agreements").[2]

E.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that, in accordance with the terms of the Pre-Petition Agreements, the Debtor is truly and justly indebted to the Lender, without defense, counterclaim or offset of any kind, and that as of the Petition Date, the Debtor was liable to the Lender in respect of loans made pursuant to the Pre-Petition Agreements in the aggregate principal amount of approximately $8,481,271.41  exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities

---

[2] Capitalized terms not otherwise defined herein shall have the definitions set forth in the Pre-Petition Agreements.

CHICAGO/#3058682.2; #897579v1

(collectively, inclusive of interest, fees, expenses and all Obligations, the "Pre-Petition Loan Indebtedness").

F.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that under the Pre-Petition Agreements and as security for repayment of the Pre-Petition Loan Indebtedness, the Debtor granted to the Lender security interests in, and liens upon, substantially all of its assets (including without limitation all Accounts (including Health-Care Insurance Receivables, if any), Chattel Paper (whether tangible or electronic), Instruments (including Promissory Notes), Documents, General Intangibles (including without limitation, all Payment Intangibles and Software, patents, trademarks, trade styles, copyrights and all other intellectual property rights, including all applications, registration and licenses therefor, and all goodwill of the business connected therewith or represented thereby); Letter-of-Credit Rights; Supporting Obligations; Deposit Accounts; Investment Property (including without limitation, certificated and uncertificated Securities, Securities Accounts, Security Entitlements, Commodity Accounts, and Commodity Contracts); Inventory; Equipment (including without limitation, all software, whether or not the same constitutes embedded software, used in the operation thereof); Fixtures; Commercial Tort Claims; rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit) which are represented by, arise from or relate to any of the foregoing; monies, personal property, and interests in personal property of the Debtor of any kind or description held by the Lender or at any time hereafter transferred or delivered to, or coming into the possession, custody, or control of, the Lender, or any agent or affiliate of the Lender, whether expressly as collateral security or for any other purpose, and all dividends and distributions on or other rights in connection with any such property; supporting

5

evidence and documents relating to any of the foregoing property, including without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of the Debtor to retrieve the same from third parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes, and other evidences of indebtedness, insurance certificates and the like, together with all books of account, ledgers, and cabinets in which the same are reflected or maintained; accessions and additions to, and substitutions and replacements of, any and all of the foregoing; proceeds and products of the foregoing, including without limitation all insurance and proceeds thereof, as more fully described in the Pre-Petition Agreements, which are incorporated herein by reference (collectively, including Cash Collateral, the "Pre-Petition Collateral")).

G.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that the Lender's security interests in and liens on the Pre-Petition Collateral were properly perfected and are valid, enforceable and non-avoidable first priority liens on and security interests in the Pre-Petition Collateral, subject to the "Prior Permitted Liens" (as defined below). The Debtor further acknowledges that all of its cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is cash collateral of the Lender within the meaning of Bankruptcy Code § 363(a) ("Cash Collateral"). The Lender is entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate protection of its interest in the Pre-Petition Collateral, including for the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral other than Cash Collateral, and for the imposition of the automatic stay.

CHICAGO/#3058682.2; #897579v1

H.     Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that (1) pursuant to the "Intercreditor Agreement" (as defined below), among other things, (i) the Lender's security interests in, and liens upon, the Pre-Petition Collateral are senior and prior in right to the security interests and liens of BIP, if any, in and upon the Pre-Petition Collateral, and (ii) the payment of any "Second Lien Obligations" (as defined in the Intercreditor Agreement) are subordinate and subject in right and time of payment to all "First Lien Obligations" (other than "Excluded First Lien Obligations") (both terms as defined in the Intercreditor Agreement), and (2) pursuant to the "Subordination Agreement" (as defined below), among other things, (i) the Lender's security interests in, and liens upon, the Pre-Petition Collateral are senior and prior in right to the security interests and liens of Subordinated Creditor (as defined in the Subordination Agreement), in and upon the Pre-Petition Collateral, and (ii) the payment of the "Subordinated Obligations" (as defined in the Subordination Agreement) are subordinate and subject in right and time of payment of the "Senior Indebtedness" (as defined in the Subordination Agreement).

I.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that the Debtor granted BIP security interests in, and liens upon, the Pre-Petition Collateral, junior only to the liens granted to Lender.

J.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that, in accordance with the terms of the agreements establishing the Second Lien Obligations, the Debtor is truly and justly indebted to BIP, without defense, counterclaim or offset of any kind,

and that as of the Petition Date, the Debtor was liable to BIP in respect of loans made pursuant to the Pre-Petition Agreements in the aggregate principal amount of approximately $5,000,000 exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities (collectively, inclusive of interest, fees, expenses and all Obligations, the "Second Lien Loan Indebtedness").

K.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), the Debtor acknowledges and stipulates that BIP's security interests in and liens on the Pre-Petition Collateral were properly perfected and are valid, enforceable and non-avoidable liens on and security interests in the Pre-Petition Collateral, subject to the liens of the Lender and "Prior Permitted Liens".  The Debtor further acknowledges that all of its cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is Cash Collateral of BIP.  Subject to the terms of the Intercreditor Agreement, BIP is entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate protection of its interest in the Pre-Petition Collateral, including for the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral other than Cash Collateral, and for the imposition of the automatic stay.

L.      The Debtor has represented that an immediate need exists for the Debtor to have access to Cash Collateral in order to operate its business in the ordinary course of business or operate its business and maintain its property in accordance with state and federal law, and has commenced an orderly sale process for its business and assets as a going concern to the extent possible.  In order to complete its orderly sale process and maximize the value of its assets for the benefit of its creditors and estate, the Debtor has an immediate need for the use of Cash Collateral.  In the absence of the use of Cash Collateral, the orderly sale of the Debtor's business

8

and assets as a going concern would not be possible, and would cause serious and irreparable harm to the Debtor, its business, and its estate.

M.      The Debtor has requested, pursuant to Bankruptcy Code § 363(c), that the Lender and BIP consent to the Debtor's use of Cash Collateral and the Debtor's use, sale and lease of the other Pre-Petition Collateral pursuant to the terms and conditions of this Order during the term of this Order.   The Debtor acknowledges and agrees that the Lender and BIP are entitled to adequate protection pursuant to Bankruptcy Code §§ 361 and 363(e) with respect to Cash Collateral and other Pre-Petition Collateral to compensate the Lender and BIP, subject to the terms of the Intercreditor Agreement, for any loss or diminution in the value of Cash Collateral or other Pre-Petition Collateral resulting from the Debtor's use of Cash Collateral, the use, sale or lease of other Pre-Petition Collateral and the imposition of the automatic stay during the term of this Order.

N.      Subject to the entry, and continued effectiveness, of this Order, the Lender and BIP have consented to the Debtor's use of Cash Collateral and use, sale or lease of other Pre-Petition Collateral during the term of this Order.   The foregoing notwithstanding, nothing in this Order shall be construed as limiting or prohibiting the Lender from objecting to any relief sought by the Debtor in this Chapter 11 Case, including, without limitation, any DIP Financing[3] or any motion for the further use of Cash Collateral, other than the entry of this Order.

O.      As evidenced by that certain *Notice of Entry of Interim Order, Proposed Form of Final Order, and Deadline to Object to Cash Collateral Motion with Respect to the Debtor Stratitude, Inc.* and *Certificate of Service* attached thereto [Docket No. 229], notice of the Final

---

[3] The term "DIP Financing" means any debtor-in-possession financing facility, cash loans or liquidity facility provided to the Debtor pursuant to Section 364 of the Bankruptcy Code secured by liens on and against property of the Debtor's estate.  Any party that provides the Debtor with DIP Financing shall be referred to as a "DIP Lender."

CHICAGO/#3058682.2; #897579v1

Hearing and the relief requested in the Motion has been given to (i) the Office of the United

States Trustee, (ii) counsel to the Lender, (iii) counsel to BIP, (iv) counsel to the Committee, (v)

the creditors holding the 20 largest unsecured claims against the Debtor.   Under the

circumstances, such notice of the Final Hearing and the relief requested in the Motion and as

granted in this Order is authorized adequate under Bankruptcy Code §§ 102(1) and 363(c) and

Bankruptcy Rules 2002 and 4001(b), and no other or further notice need be given.

P.      At the Final Hearing, the Court considered representations made by counsel,

offers of proof, and/or testimony regarding:

(i)      the negotiations pertaining to this Order;

(ii)     the necessity for this Order; and

(iii)    the events leading up to the filing of this Chapter 11 Case by the Debtor.

Q.      Based on the record presented to the Court by the Debtor at the Preliminary

Hearing and the Final Hearing, the Debtor and the Lender and their respective agents, advisors

and employees have acted in good faith in negotiating, consenting and agreeing to the Debtor's

use of Cash Collateral and use, sale and lease of other Pre-Petition Collateral as contemplated

and provided by this Order.   The negotiation of the terms and provisions of this Order have been

conducted at arm's length, and the Court finds that such terms and conditions are fair and

reasonable, under the circumstances, and reflect the Debtor's exercise of reasonable business

judgment consistent with the Debtor's fiduciary duties.

R.      The permission granted herein to use Cash Collateral is necessary to the Debtor in

this Chapter 11 Case.   This Court concludes that entry of this Order is in the best interest of the

Debtor's estate and creditors as their implementation will, among other things, provide the

Debtor with the necessary funds to conduct and complete the orderly sale of the Debtor's

CHICAGO/#3058682.2; #897579v1

business as a going concern to the extent possible and maximize the value of the Debtor's assets for the benefit of its creditors and estate.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AND AGREED BETWEEN THE PARTIES HERETO THAT:

1.    <u>Motion Granted</u>.  The Motion is granted, subject to the terms and conditions set forth in this Order.

2.    <u>Pre-Petition Agreement</u>.  During the term of this Order and as modified thereby, the terms of the Pre-Petition Agreements shall continue in full force and effect.

3.    <u>Authorized Uses of Cash Collateral</u>.  The Debtor is hereby authorized to use Cash Collateral during term of this Order to pay only the ordinary and reasonable expenses of operating its business, as limited by the Budget described in Paragraph 9 herein; <u>provided</u> that the Lender and BIP are granted adequate protection for any diminution in the value of the Collateral resulting from (i)  the Debtor's use of Cash Collateral pursuant to Bankruptcy Code § 363(c), (ii) the use, sale or lease of the Collateral (other than Cash Collateral) pursuant to Bankruptcy Code § 363(c) (all such use of Cash Collateral and other Collateral  and the extent of any diminution in value thereafter after the Petition Date collectively shall constitute, the "<u>Post-Petition Indebtedness</u>") and (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a) as follows:

> (i)    the Lender shall be and hereby is granted (effective upon the date of this Order and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens on, all of the Debtor's right, title and interest in, to and under the Collateral, subject and subordinate only to (y) the Carve-Out and (z) any validly perfected security interest or lien senior to the Liens of the Lender on the Petition Date (the "<u>Prior Permitted Liens</u>") (after giving effect to this Order);

11

(ii)    subject and subordinate to the Carve-Out, if and to the extent the adequate protection of the interests of the Lender in the Collateral pursuant to this Order proves insufficient, the Lender shall be and hereby is granted an administrative expense claim under section 507(b) of the Bankruptcy Code (the "<u>Superpriority Claims</u>") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b) and 726, and shall at all times be senior to the rights of the Debtor.  The Superpriority Claims may not be paid from recoveries obtained pursuant to any avoidance actions (the "<u>Chapter 5 Actions</u>") under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550 or 553 and the proceeds thereof, which are expressly excluded from all Liens of the Lender and BIP. Subject and subordinate only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 105, 503(b), 507(b) or otherwise, including those resulting from the conversion of any of this Chapter 11 Case pursuant to Bankruptcy Code § 1112, shall be senior to, or <u>pari</u> <u>passu</u> with, the Superpriority Claims of the Lender; and

(iii)    BIP shall be and hereby is granted (effective upon the date of this Order and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens on (together with the liens granted to the Lender in Paragraph 3(i) above, the "<u>Replacement Liens</u>"), all of the Debtor's right, title and interest in, to and under the Collateral, with the exception of any Chapter 5 Actions and the proceeds thereof, subject and subordinate only to (x) the Carve-Out, (y) the Liens granted pursuant to this Order and the Pre-Petition Agreements to the Lender and (z) any Prior Permitted Liens (after giving effect to this Order) prior in interest and senior to the Liens granted to the Lender pursuant to this Order and the Pre-Petition Agreements.

The Chapter 5 Actions are hereby assigned to the Committee for the benefit of the Debtor's estate, and the Committee shall have exclusive standing to bring any Chapter 5 Action under chapter 5 of the Bankruptcy Code and/or any "Challenge" (as defined below); provided, however, that in consideration for the Lender's agreement not to assert a security interest in and lien on the Chapter 5 Actions for its Post-Petition Indebtedness, the Lender is granted a security interest in twenty-five percent (25%) of the net proceeds from the Chapter 5 Actions.

CHICAGO/#3058682.2; #897579v1

4.      <u>Adequate Protection</u>.  Under the circumstances, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Lender and BIP; <u>provided</u>, <u>however</u>, that nothing herein contained shall affect or impair the Lender's or BIP's right to seek additional adequate protection of their interests, provided that, with respect to BIP, no such request shall be in contravention of the Intercreditor Agreement.  Notwithstanding any other provision hereof, the grant of adequate protection to the Lender and to BIP pursuant hereto is without prejudice to (a) the right of the holders of any Prior Permitted Liens to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and (b) the right of the Debtor or any other party in interest to contest any such modification.

5.      <u>Priorities</u>.  The Replacement Liens shall be prior and senior to all liens and encumbrances (other than Prior Permitted Liens) of all other secured creditors in and to such Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor).  The Replacement Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens, and the Lender shall not be required to file or serve financing statements, notices of lien or similar instruments in respect of the Pre-Petition Loan Indebtedness which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtor to execute any documentation relating to the Replacement Liens shall in no way affect the validity, perfection or priority of such Replacement Liens.  If, however, the Lender and BIP at their sole discretion shall determine to file any such financing statements, notices of lien or similar instruments, or to

13

otherwise confirm perfection of such Replacement Liens, (i) the Debtor is authorized and directed to cooperate with and assist in such process, as may be reasonably necessary, (ii) the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and (iii)  all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

6. <u>Continued Effectiveness of Intercreditor Agreement and Subordination Agreement</u>.  The provisions of (i) any intercreditor agreements or subordination agreements that subordinate liens and security interests to the liens and security interests of the Lender, including without limitation, (y) that certain Intercreditor and Subordination Agreement, dated as of November 3, 2016 (as amended, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>") by and between the Lender and BIP, and (z) that certain Subordination Agreement, dated as of November 3, 2016 (as amended, supplemented or otherwise modified from time to time, the "<u>Subordination Agreement</u>") by and among the Debtor, the Lender, Pankaj Kalra, Ashish Sanan and Khannan Sankaran, or (ii) other indentures that subordinate any claims to the claims of the Lender, shall remain in full force and effect and shall continue with respect to the liens and security interests granted to the Lender in the Collateral.

7. <u>Carve-Out</u>.  Any provision of this Order or the Pre-Petition Agreements to the contrary notwithstanding, the Liens and Superpriority Claims granted to the Lender and BIP pursuant to the Pre-Petition Agreements and this Order shall be subject and subordinate to a carve-out  (the "<u>Carve-Out</u>") for (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (in such amounts as agreed to by the United States Trustee or as determined by the

14

Court) and any fees payable to the Clerk of the Bankruptcy Court, (b) the aggregate allowed unpaid fees and expenses payable under Bankruptcy Code §§ 330, 331 and/or 363 to each professional person retained by the Debtor pursuant to an order of this Court (the "DIP Professionals"), including the Debtor's approved attorneys and financial advisor and the Committee (the "Committee Professionals"), including the Committee's approved attorneys and financial advisor (other than fees and expenses, if any, of such professional persons incurred, directly or indirectly, in respect of, arising from or relating to the investigation, initiation or prosecution of any cause of action (i) against the Lender and BIP, (ii) the Lender or BIP, or (iii) with respect to the Post-Petition Indebtedness, the Pre-Petition Loan Indebtedness, the Pre-Petition Agreements or the Second Lien Obligations) in an amount not to exceed the unpaid amounts budgeted in any approved Budget on an accrual basis (for periods prior to and including the Termination Date and, including without limitation, for periods during and after confirmation of a plan of reorganization, whenever ultimately allowed by the Court) for each such professional, less any pre-petition retainer held by any such professional (the "Professionals' Carve-Outs"), and (c) all other fees and expenses set forth in the Budget in an amount not to exceed the unpaid amounts budgeted in any approved Budget on an accrual basis for periods prior to and including the Termination Date.  The Professionals' Carve-Outs may be increased if and only to the extent that the Lender agrees in writing in its sole discretion.  Subject to any orders entered by the Court regarding interim compensation of the DIP Professionals and the Committee Professionals, the DIP Professionals and the Committee Professionals shall submit to the Debtor, with a copy to the Lender and the Committee, copies of its bills for fees and expenses on a monthly basis (to be redacted as appropriate in the DIP Professionals' and the Committee Professionals' respective discretion).  Notwithstanding anything herein to the contrary, no

CHICAGO/#3058682.2; #897579v1

Collateral, Cash Collateral, or any portion of the Carve-Out may be used to prosecute, object to or contest in any manner, or raise any defenses to, the amount, validity, perfection, priority, extent or enforceability of the Pre-Petition Loan Indebtedness or the liens securing the Pre-Petition Loan Indebtedness, or to prosecute or assert any claims or causes of action against the Lender and BIP.  Notwithstanding any of the foregoing, the Committee may use up to $5,000 of the Carve-Out for Committee Professionals to investigate the claims and liens of the Lender.  Except for the Carve-Out, no costs or expenses incurred in connection with the administration of this Chapter 11 Case or any conversion of this Chapter 11 Case pursuant to Bankruptcy Code § 1112, or in any future proceedings or cases related hereto, whether incurred pursuant to Bankruptcy Code § 726(b) or otherwise, shall be charged against the Pre-Petition Loan Indebtedness or the Collateral, pursuant to Bankruptcy Code § 506(c) or otherwise, without the express written consent of the Lender.

8.      <u>Application of Cash Proceeds</u>.  Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 22), proceeds or payments received by the Lender with respect to the Collateral upon which the Lender had security interests or liens shall be applied as follows:

a.      first, to the payment of all reasonable costs, fees and expenses, including attorneys' fees, of the Lender as set forth in Paragraph 16;

b.      second, to the payment of the Post-Petition Indebtedness consisting of accrued and accruing interest;

c.      third, to the payment of the Post-Petition Indebtedness consisting of principal;

16

      d.      fourth, to the payment of the Pre-Petition Loan Indebtedness consisting of accrued and accruing interest; and

      e.      fifth, to the payment of the Pre-Petition Loan Indebtedness consisting of principal;

provided, however, that the Court reserves the right to re-allocate such payments in the event and to the extent that it is determined by the Court that Lender did not maintain valid, perfected and enforceable liens on any of the Pre-Petition Collateral.  If, in the course of this Chapter 11 Case, and contrary to the above provisions, the Court grants liens or security interests to others pursuant to Bankruptcy Code § 364(d) or any other provision of the Bankruptcy Code, which liens or security interests are senior or equal to the liens or security interests of the Lender in the Collateral described above (collectively, "Subsequent Liens"), then any proceeds of loans or extensions of credit secured by such Subsequent Liens shall be applied first to payment of the Pre-Petition Loan Indebtedness, including all attorneys' fees, costs and expenses, and the Lender shall retain all liens and security interests held by it on the Collateral until all of the Pre-Petition Loan Indebtedness is paid in full, and then to the Post-Petition Indebtedness.

      9.      Budget.   Attached hereto as Exhibit A is an eleven (11) week budget (the "Budget") for the period from week ending October 13, 2017 through and including the week ending December 29, 2017, which has been consented to by the Lender and BIP.   Any subsequent budget will go into effect upon the approval of the Debtor, the Lender, BIP, the Committee, and the Office of the United States Trustee without further order of the Court (and each subsequent budget so approved shall be included in the definition of the term "Budget" as used in this Order).   The Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Debtor

expects to incur during each week of the Budget.  The Debtor shall be authorized to use the Cash Collateral only for payment of such items as are set forth in the Budget and subject to the terms and conditions set forth in the Pre-Petition Agreements as modified by this Order.  The Budget may be revised at the end of each week during the term of this Order, subject to the consent of the Lender.  Not later than the fourth (4th) business day of each week commencing with the second week of the period covered by the Budget, the Debtor shall provide the Lender and BIP with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Budget for that period.  Revenues less than ninety percent (90%) of the budgeted amount for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period of the Budget ("Allowed Revenue Variance") shall constitute a "Default" (as defined below) in accordance with the provisions of this Order unless waived by the Lender in writing.  Any disbursement by the Debtor other than for budgeted amounts as set forth in the Budget shall constitute a Default in accordance with the provisions of this Order unless the Lender consents to those changes in writing; provided, however, that the Debtor may make payments in excess of the total budgeted disbursements so long as (i) the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10.0%) of the budgeted disbursements for that week; and (ii) the Variance Percent of the aggregate of all actual disbursements for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period shall not exceed ten percent (10.0%) of the aggregate of all budgeted disbursements for such four-week period (subsections (i) and (ii) above are collectively, the "Allowed Disbursement Variance").  For the avoidance of doubt, any amount

18

included in the Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Budget and shall be included in the Carve-Out.

10.    <u>Cash Management</u>.  The Debtor shall continue its pre-petition cash management system pursuant to the cash management order entered at the "first day" hearing.

11.    <u>Accounting for Cash</u>.  Immediately upon the entry of this Order, the Debtor shall account to the Lender for all cash, checks, notes, drafts, instruments, acceptances or other property representing cash or other proceeds of the Pre-Petition Collateral in the Debtor's possession, custody or control.  All cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of the Debtor (collectively, "<u>Cash Proceeds</u>") currently in the possession of the Debtor or in any accounts in financial institutions, including any lock box or depository accounts, shall be deemed proceeds of the Collateral unless such proceeds are specifically identified as not being proceeds of Collateral.  All Cash Proceeds shall be remitted to the Lender in accordance with the terms of this Order and subject to Paragraph 8 hereof.

12.    <u>Term of Use of Cash Collateral</u>.  The agreement by the Lender and BIP to allow the use of Cash Collateral and the Collateral shall continue throughout the term of this Order, unless terminated prior to this date upon the occurrence of the Termination Date or otherwise pursuant to the terms of this Order.

13.    <u>Termination Date</u>.  Except for payment of the Carve-Out, the Debtor's right to use Cash Collateral shall terminate upon three (3) business days' written notice ("<u>Default Notice</u>") to the Debtor, the Office of the United States Trustee, and the Committee if a Default occurs (the date of any such termination, the "<u>Termination Date</u>"), and the Debtor (a) may not use, sell or lease Cash Collateral, (b) shall segregate and account for any Cash Collateral in its possession,

19

custody or control, (c) shall hold such Cash Collateral for the exclusive benefit of the Lender, subject to further order of the Court, and (d) the automatic stay pursuant to Bankruptcy Code § 362(a) shall be deemed lifted and modified, without further order of this Court, to permit the Lender to exercise any and all of its rights and remedies under the Pre-Petition Agreements and this Order; provided, however, that the obligations and rights of the Lender and the Debtor with respect to all transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected by any such termination and shall survive such termination (including without limitation, all obligations, disbursements, and rights related to the Carve-Out); and provided further that upon such termination the Lender shall be deemed to have retained all of its rights and remedies, including, without limitation, as provided in the Pre-Petition Agreements and under the Bankruptcy Code.

14.   Defaults.   A Default under this Order shall include: (i) the entry of an order dismissing this Chapter 11 Case or converting this Chapter 11 Case to a Chapter 7 case, (ii) the entry of an order appointing a Chapter 11 trustee in this Chapter 11 Case, (iii) the entry of an order granting any other claim superpriority status or a lien (other than a Prior Permitted Lien) equal or superior to the Replacement Liens granted to the Lender (except pursuant to an order under Bankruptcy Code § 506(c)), (iv) the entry of an order staying, reversing, vacating or otherwise modifying this Order without the Lender's prior written consent, (v) the entry of an order in this Chapter 11 Case appointing an examiner having enlarged powers beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4), (vi) subject to any applicable cure periods under the Pre-Petition Agreements, an "Event of Default" as defined under the Pre-Petition Agreements other than (A) defaults that have occurred, are existing, and/or are continuing as of the date of entry of this Order, (B) defaults related to any financial covenants, (C) defaults

20

related to reporting requirements, and (D) defaults related to the filing of this Chapter 11 Case or

the consequences thereof , (vii) the entry of any order granting any relief from the automatic stay

so as to allow a third party to proceed against material assets of the Debtor, other than relating to

assets subject to Prior Permitted Liens which if granted will not materially or adversely affect

current operations, (viii) the commencement by the Debtor of other actions adverse to the Lender

or its rights and remedies under this Order, or any other Bankruptcy Court order, or (ix) the

Allowed Revenue Variance or the Allowed Disbursement Variance as set forth in Paragraph 9

herein, is exceeded.

15.    _Remedies_.  Upon the occurrence of a Default, the Lender may exercise its rights

and remedies and take all or any of the following actions without further modification of the

automatic stay pursuant to Bankruptcy Code § 362 which is hereby deemed modified and

vacated to the extent necessary to permit such exercise of rights and remedies and the taking of

such actions and without further order of or application to this Court: (a) enjoin and prohibit the

Debtor from using Cash Collateral to the extent that such Default would permit such relief under

the Pre-Petition Agreements, as amended hereby; (b) suspend amounts in any accounts

maintained with the Lender, or otherwise enforce rights against all or part of any Collateral in the

possession of the Lender to the extent that such Default would permit such relief under the Pre-

Petition Agreements, as amended hereby; and/or (c) subject to the provisions of Paragraph 13

above, take any other action or exercise any other right or remedy of the Lender under the Pre-

Petition Agreements, this Order or by operation of law.  Notwithstanding the Lender's rights and

remedies provided in this Order, upon the occurrence of a Default, the Lender shall have the

obligation to fund the Carve-Out as provided in Paragraph 7.  Upon the Debtor's receipt of a

Default Notice, it shall immediately cease making any disbursements except those already

21

accrued in accordance with the Budget, subject to further order of the Court after notice and a hearing, including on motions brought by the Debtor or the Committee.

16.   <u>Lender's Fees and Expenses</u>.   Without further order of this Court, and in consideration of other accommodations provided by the Lender, the Debtor shall reimburse the Lender for all reasonable out-of-pocket filing and recording fees, if any, reasonable attorneys' and paralegals' fees, fees of the "Lender's Consultants" (as defined below), and costs and expenses and internal audit fees and expenses incurred by the Lender: (i) in the preparation and implementation of this Order, (ii) in the representation of the Lender in the proceedings, and (iii) as otherwise provided in the Pre-Petition Agreements.   The Debtor and the Committee reserve the right to object to the Lender's fees as unreasonable. Subject to the Lender's discretion, the reimbursement contemplated hereby may be made by deducting such amounts from collections of the Lender.  The reimbursement and fees described in this Paragraph 16 shall not affect the payment of any other budgeted items in the Budget or be included in any calculations of the Allowed Revenue Variance or the Allowed Disbursement Variance.

17.   <u>Financial Reports</u>.  The Debtor is hereby required to deliver to the Lender, the Committee and BIP such other financial and other information concerning the business and affairs of the Debtor as the Lender, the Committee or BIP shall reasonably request from time to time, <u>provided</u> <u>however</u> that the Debtor reserves its right to claim that any such documents are protected under attorney-client privilege to the extent permitted under applicable law.   The Debtor shall cooperate with and permit the Lender, the Committee and BIP to perform physical inventories of all assets in the Debtor's facilities at any reasonable times requested by the Lender or the Committee.  The Debtor shall further provide the Lender, the Committee and BIP with

CHICAGO/#3058682.2; #897579v1

detailed information as to the extent and composition of the Collateral and any collections thereon.

18.     <u>Intentionally omitted</u>.

19.     <u>Survival</u>.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order, including without limitation (a) confirming any plan of reorganization in any of this Chapter 11 Case; (b) converting this Chapter 11 Case to a Chapter 7 case; or (c) dismissing this Chapter 11 Case, and the terms and provisions of this Order as well as the Superpriority Claims, Liens and Replacement Liens granted pursuant to this Order and the Pre-Petition Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, Liens and Replacement Liens shall maintain their priority as provided by this Order until all Pre-Petition Loan Indebtedness and all Post-Petition Indebtedness is indefeasibly paid in full and discharged.

20.     <u>Lender's Consultants</u>.  The Lender may, at its sole discretion, retain additional third party consultants selected by the Lender to review matters pertaining to the business and property of the Debtor, each at the Debtor's sole reasonable expense (collectively, the "<u>Lender's Consultants</u>"), which expense (a) shall not affect (i) the payment of any other budgeted items in the Budget, or (ii) be included in any calculations of the Allowed Revenue Variance or the Allowed Disbursement Variance, and (b) shall constitute Post-Petition Indebtedness of the Debtor.  The Debtor will permit the Lender's Consultants to examine the respective corporate, financial and operating records, and, at the Debtor's sole reasonable expense, make copies thereof, inspect the assets, properties, operations and affairs of the Debtor, visit any or all of the offices of the Debtor to discuss such matters with its officers, independent auditors, accountants or consultants (and the Debtor hereby authorizes such independent auditors, accountants and

23

consultant to discuss such matters with the Lender's Consultants), and the Debtor will cooperate with the Lender's Consultants in all respects. Copies of invoices for the Lender's Consultants and any third party consultants selected by BIP (collectively, the "Consultants") shall be provided to the Office of the United States Trustee, the Debtor, and the Committee. The Debtor, the Committee, and the Office of the United States Trustee reserve the right to object to the invoices for the Consultants on the basis of lack of reasonability.

21.    Releases.  Conditioned upon Paragraph 22, in consideration for the use of Cash Collateral, the Debtor on behalf of itself and its successors and assigns (collectively, the "Releasors"), shall forever release, discharge and acquit the Lender and BIP and their respective officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" claims or defenses, which arose on or prior to the date this Order is entered solely with respect to the Debtor, the Pre-Petition Loan Indebtedness, the Second Lien Loan Indebtedness, the Post-Petition Indebtedness, the Collateral or the Pre-Petition Agreements.

22.    Contest Period.  The findings contained in recital paragraphs of this Order and the releases granted in Paragraph 21 of this Order shall be binding upon all parties in interest, including without limitation, the Debtor and the Committee, unless a party in interest or Committee has properly filed an adversary proceeding or commenced a contested matter (subject to the limitations set forth in Paragraph 6) challenging the amount, validity, enforceability, perfection or priority of the Pre-Petition Loan Indebtedness or the Lender's liens on the Pre-Petition Collateral in respect thereof or the Second Lien Loan Indebtedness or BIP's liens on the

24

Pre-Petition Collateral, no later than a date that is (i) seventy-five (75) days after the entry of this

Order for any party in interest, and (ii) December 23, 2017, for the Committee, and the Court

subsequently enters a judgment in favor of the plaintiff in any such timely and properly filed

adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is

properly commenced as of such respective date, the Pre-Petition Loan Indebtedness, or, as the

case may be, the Second Lien Loan Indebtedness, shall constitute an allowed fully secured claim,

not subject to subordination and otherwise unavoidable respectively.  Subject only to the rights

set forth in this paragraph, for all purposes in this Chapter 11 Case and any subsequent Chapter 7

case, the Lender's and BIP's liens on the Pre-Petition Collateral shall be deemed legal, valid,

binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and

otherwise unavoidable, and the Lender, the Pre-Petition Loan Indebtedness and the Lender's

liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by any

party in interest seeking to exercise the rights of the Debtor's estate, including without limitation,

any successor thereto, and BIP, the Second Lien Loan Indebtedness and BIP's liens on the Pre-

Petition Collateral shall not be subject to any other or further challenge by any party in interest

seeking to exercise the rights of the Debtor's estate, including without, limitation, any successor

thereto.  If any such adversary proceeding or contested matter is properly commenced as of such

date, the findings contained in the recital paragraphs of this Order shall nonetheless remain

binding on all parties in interest except to the extent that such findings were expressly challenged

in such adversary proceeding or contested matter, and all claims other than those claims raised in

such challenge shall be subject to the releases contained in Paragraph 21 of this Order.  If such

adversary proceeding or contested matter is dismissed or adjudicated in favor of the Lender, the

findings and releases contained herein shall be effective.

CHICAGO/#3058682.2; #897579v1

23.   <u>Order Binding</u>.  The provisions of this Order shall be binding upon and inure to the benefit of the Lender and its successors and assigns, and the Debtor, and its successors and assigns, including any trustee or other fiduciary hereafter appointed in this Chapter 11 Case as a legal representative of the Debtor or its estate.

24.   <u>Credit Bid</u>.  The Lender shall have the right to "credit bid" up to the amount of the Pre-Petition Loan Indebtedness and the Post-Petition Indebtedness as of the date of such bid during any sale of any portion, all, or substantially all of the Debtor's assets to the extent it includes the sale of Collateral, including without limitation, sales occurring pursuant to Bankruptcy Code § 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code § 1129(b)(2)(A)(iii).

25.   <u>Marshaling</u>.  In no event shall the Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any Collateral unless raised in a Challenge before expiration of the applicable contest period.

26.   <u>Proof of Claim</u>.  The Lender may, but shall not be required to, file a Proof of Claim in this Chapter 11 Case.

27.   The Debtor is authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Pre-Petition Agreements, as the Lender may reasonably require, or which otherwise may be deemed reasonably necessary by the Lender to effectuate the terms and conditions of this Order and the Pre-Petition Agreements.

28.   All rights granted to the Committee and the Committee Professionals under the final cash collateral order entered in the Quadrant 4 bankruptcy case [Docket No. 162], including but not limited to the carve-out provisions under Paragraph 6 of that order, and the authority to

CHICAGO/#3058682.2; #897579v1

use such funds in both the Quadrant 4 and the Debtor's bankruptcy cases, are hereby incorporated herein by reference.

29.      To the extent there exists any conflict between the Pre-Petition Agreements and the terms of this Order, this Order shall govern.

30.      No Third Party Rights.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtor, the Lender, BIP, and the Committee.

31.      Retention of Jurisdiction.   This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.

ENTER:


_____
UNITED STATES BANKRUPTCY JUDGE


STIPULATED AND AGREED:                    AGREED:

**ADELMAN & GETTLEMAN, LTD.**            **NELSON MULLINS RILEY & SCARBOROUGH, LLP**


By:_____                 By:_____

Chad H. Gettleman, Esq. (ARDC #944858)   Peter J. Haley, Esq.
Nathan Q. Rugg, Esq. (ARDC #6272969)     One Post Office Square
53 West Jackson Blvd., Suite 1050        Boston, Massachusetts  02109
Chicago, Illinois  60604                 Telephone: (617) 217-4714
Telephone:  (312) 435-1050               Facsimile: (617) 217-4750
Facsimile:  (312) 435-1059               Counsel to BIP Lender, LLC
Counsel to the Debtor

27

**VEDDER PRICE P.C.**

By:_____

Douglas J. Lipke, Esq. (IL Bar No. 0312457)
Stephanie K. Hor-Chen, Esq. (IL Bar No. 6283105)
222 N. LaSalle Street, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 609-7500
Facsimile:  (312) 609-5005
Counsel to BMO Harris Bank, N.A.

**SUGAR FELSENTHAL GRAIS &
HAMMER LLP**

By:_____

Aaron L. Hammer, Esq. (ARDC #6243069)
Michael Brandess, Esq. (ARDC #6299158)
30 N. LaSalle Street, Suite 3000
Chicago, IL 60602
Tel: 312-704-2170
Facsimile: 312-372-7951
Counsel to the Committee

CHICAGO/#3058682.2; #897579v1

# EXHIBIT A - BUDGET

CHICAGO/#3058682.2

**Stratitude, Inc.**
**Weekly Cashflow**

| Week Ending | Forecast 20-Oct-17 | Forecast 27-Oct-17 | Forecast 3-Nov-17 | Forecast 10-Nov-17 | Forecast 17-Nov-17 | Forecast 24-Nov-17 | Forecast 1-Dec-17 | Forecast 8-Dec-17 | Forecast 15-Dec-17 | Forecast 22-Dec-17 | Forecast 29-Dec-17 | Total 10/20 - 12/29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collections** | | | | | | | | | | | | |
| A/R Collections | 93,216 | 114,405 | 86,289 | 93,815 | 122,578 | 86,289 | 86,289 | 117,235 | 234,470 | 175,852 | 58,617 | 1,269,056 |
| **Total Collections** | 93,216 | 114,405 | 86,289 | 93,815 | 122,578 | 86,289 | 86,289 | 117,235 | 234,470 | 175,852 | 58,617 | 1,269,056 |
| | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | |
| *Payroll* | | | | | | | | | | | | |
| Payroll - Stratitude | | | | 440,000 | | | | 440,000 | | | 440,000 | 1,320,000 |
| Payroll - Processing | | | | 1,000 | | | | 1,000 | | | 1,000 | 3,000 |
| **Total Payroll and Payroll processing** | - | - | - | 441,000 | - | - | - | 441,000 | - | - | 441,000 | 1,323,000 |
| | | | | | | | | | | | | |
| **Vendors - Software, Hosting and Subscription Services** | | | | | | | | | | | | |
| Vendors | | | 22,882 | 22,882 | 22,882 | 22,882 | 22,882 | 25,878 | 25,878 | 25,878 | 354,878 | 546,920 |
| Dues and Subscriptions - Recurring | | 3,000 | 750 | 750 | 750 | 3,000 | 3,000 | 750 | 750 | 750 | 3,000 | 15,000 |
| **Total Vendors - Software, Hosting and Subscription Services** | - | 3,000 | 23,632 | 23,632 | 23,632 | 25,882 | 25,882 | 26,628 | 26,628 | 26,628 | 357,878 | 564,920 |
| | | | | | | | | | | | | |
| **Facility Expenses** | | | | | | | | | | | | |
| Rent | 7,000 | | 4,500 | | | | | 4,500 | | | | 16,000 |
| Utilities, Telephone & Internet | 500 | 500 | 500 | 500 | 500 | 250 | 250 | 250 | 250 | 250 | 250 | 4,000 |
| **Total Facility Expenses** | 7,500 | 500 | 5,000 | 500 | 500 | 250 | 250 | 4,750 | 250 | 250 | 250 | 20,000 |
| | | | | | | | | | | | | |
| **Insurance Expenses** | | | | | | | | | | | | |
| Business Insurance | | 22,000 | | | | 22,000 | 22,000 | | | 22,000 | 22,000 | 66,000 |
| Medical Insurance | | | | | | | | | | | | |
| **Total Insurance Expenses** | - | 22,000 | - | - | - | 22,000 | 22,000 | - | - | 22,000 | 22,000 | 66,000 |
| | | | | | | | | | | | | |
| **Professional Fees** | | | | | | | | | | | | |
| Accounting Fees | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 13,750 |
| Placement Fees | 150 | 150 | 150 | 150 | 150 | | | | | | | 750 |
| Attorney - Immigration (Including Dept. of Homeland Security Fees) | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 30,250 |
| Attorney - Legal Expenses (non Immigration) | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 6,600 |
| Creditors Committee Consultants [1] | | | | | | | | | | | 13,000 | 13,000 |
| United States Trustees Office | | | | | | | | | | | | |
| Silverman Consulting | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 120,000 |
| Faegre Baker Daniels LLP | | | | | | | | | | | | |
| Nixon Peabody LLP | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 1,500 | 1,500 | 1,500 | 1,500 | 20,000 |
| Adelman and Gettleman | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 10,000 | 10,000 | 200,000 |
| Lawyers - Creditors Committee [1] | | | | | | | | | | | | |
| **Total Professional Fees** | 40,350 | 40,350 | 40,600 | 40,350 | 40,350 | 35,350 | 35,350 | 30,100 | 29,850 | 19,850 | 32,850 | 390,350 |
| | | | | | | | | | | | | |
| **Other Expenses** | | | | | | | | | | | | |
| Travel Expenses | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 13,750 |
| Postage and Delivery | | 150 | | 150 | | 150 | | 150 | | | 150 | 750 |
| Estate Wind down and liquidating plan costs - Prof Fees | | | | | | | | | | 150,000 | | 150,000 |
| Estate Wind down and liquidating plan costs - Operating Exp | | | | | | | | | | 50,000 | | 50,000 |
| Bank Fees | | | 300 | | | | | 300 | | | | 600 |
| Miscellaneous & Office Expenses | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 30,250 |
| **Total Other Expenses** | 4,000 | 4,150 | 4,300 | 4,150 | 4,000 | 4,150 | 4,000 | 4,450 | 4,000 | 204,000 | 4,150 | 245,350 |
| | | | | | | | | | | | | |
| **Total Disbursements** | 52,600 | 70,000 | 73,532 | 509,632 | 68,482 | 68,382 | 87,482 | 506,928 | 60,728 | 50,878 | 1,057,978 | 2,606,620 |
| | | | | | | | | | | | | |
| **Net Cashflow** | 40,616 | 44,405 | 12,758 | (415,816) | 54,097 | 17,908 | (1,192) | (389,693) | 173,742 | 124,974 | (999,361) | (1,337,564) |

| Cash Rollforward | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beg. Cash Balance (Book - net of O/S Checks) | 825,547 | 866,163 | 910,568 | 923,326 | 507,510 | 561,606 | 579,514 | 578,321 | 188,628 | 362,370 | 487,344 | 825,547 |
| Net Cashflow | 40,616 | 44,405 | 12,758 | (415,816) | 54,097 | 17,908 | (1,192) | (389,693) | 173,742 | 124,974 | (999,361) | (1,337,564) |
| End. Cash Balance (Book - net of O/S Checks) | 866,163 | 910,568 | 923,326 | 507,510 | 561,606 | 579,514 | 578,321 | 188,628 | 362,370 | 487,344 | (512,017) | (512,017) |

| Sale Analysis | |
|---|---|
| Sale Proceeds [2] | $ 1,500,000 |
| Less: Payment per KEIP Motion | (22,500) |
| Less: Fee paid to Livingstone Partners [3] | (87,500) |
| Proceeds after IB fees and Incentives | $ 1,390,000 |
| Cash to Fund Operations | (512,017) |
| Net Proceeds from Sale of Stratitude | $   877,983 |

| Beg. Balance | 995,663 | 1,078,299 | 1,022,511 | 1,016,412 | 1,056,248 | 1,094,051 | 1,087,952 | 1,081,854 | 1,064,983 | 1,031,243 | 1,005,938 | 995,663 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Add: Revenue | 175,852 | 58,617 | 80,191 | 133,651 | 160,381 | 80,191 | 80,191 | 100,365 | 200,729 | 150,547 | 50,182 | 1,270,896 |
| Less: Collections | (93,216) | (114,405) | (86,289) | (93,815) | (122,578) | (86,289) | (85,289) | (117,235) | (234,470) | (175,852) | (58,617) | (1,269,056) |
| End. Balance | 1,078,299 | 1,022,511 | 1,016,412 | 1,056,248 | 1,094,051 | 1,087,952 | 1,081,854 | 1,064,983 | 1,031,243 | 1,005,938 | 997,503 | 997,503 |

[1] Fees incremental to Quadrant 4 filing, if any, to be determined.

[2] The Sale Proceeds are based on the current stalking horse offer of $1.5 million.

[3] $187,500 residual of minimum Livingstone Fees. Allocated $87,500 to Stratitude.